UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN DELLAPORTAS,

     Plaintiff,
-against-

HANA SHAHIN,

     Defendant.

Case No. 1:24-cv-00793-VM

**AMENDED COMPLAINT**

  Plaintiff John Dellaportas ("Plaintiff"), *pro se*, by and for his Amended Complaint against Defendant Hana Shahin ("Defendant"), hereby alleges as follows:

## INTRODUCTION

  1. This is a suit for libel, libel *per se*, fraud, intentional infliction of emotional distress, tortious interference with business relations, prima facie tort, and injurious falsehood. On January 29, 2022, Defendant—falsely posing as a "veteran of the Vietnam War that took place in the 60s"—drafted and caused to be sent an email from an anonymous Hotmail account to hundreds of Plaintiff's friends, neighbors, clients and coworkers, raising entirely fabricated allegations against Plaintiff of various acts of criminality (the "Libelous Email"). The Libelous Email contained a series of allegations against Plaintiff—all invented by Defendant—of fraud, embezzlement, professional misconduct and other alleged acts of wrongdoing. Defendant's stolen valor arose solely out of malice, which she employed to injure Plaintiff personally and professionally. Defendant had a personal vendetta against Plaintiff stemming from an earlier incident in which she had demanded Plaintiff procure a management position for her at his place of employment, but he was unable to do so, and for Plaintiff's later criticism of her racially motivated harassment of their building's Resident Manager. In response, Defendant leveled an escalating series of false and defamatory attacks on Plaintiff, culminating in the Libelous Email. Upon receipt thereof, Plaintiff demanded its retraction, but no retraction was forthcoming.

2. Accordingly, Plaintiff now brings this action against Defendant for her malicious and malevolent actions against him, which have caused and will continue to cause him injury of no less than $20 million, including special damages of no less than $2,883,004.83.

## JURISDICTION

3. If Defendant's claim of California citizenship in her Notice of Removal is correct, then this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

4. This Court has personal jurisdiction pursuant to CPLR 301 because the causes of action arose in substantial part out of Defendant's activities in the State of New York.

5. Venue is proper pursuant to 28 U.S. Code § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

6. Plaintiff is a natural person and citizen of the State of New York.

7. Defendant is a natural person who was a citizen of the State of New York during the events at issue, and who now alleges to be a citizen of the State of California.

## BACKGROUND

8. Since 1994, Plaintiff has resided with his wife in Liberty House Condominium, an apartment building located in Lower Manhattan (the "Building"). From 2003 to 2019, Plaintiff volunteered his services to the Board of Managers of Liberty House Condominium (the "Board"), including a six-and-a-half year-stint as Board President.

9. Plaintiff first met Defendant in or around 2018. Upon information and belief, Defendant first moved into the Building in or around 2014 or 2015. Raised in the Netherlands and France, she first came to this country with her then-husband in December 2019 on a visa. In a CV from around that time, she described her language skills as "Fluent in French and Dutch. proficient

in English." After her divorce in 2013, she moved into the Building with her now current husband, who had owned a unit in the Building for many years preceding her arrival.

10.     In or around 2018, Defendant approached Plaintiff in quire about running for the Board.  In the ensuing election in 2019, Plaintiff supported her candidacy and, in 2020, when after he retired from the position, Plaintiff endorsed her to become Board President.  For some time thereafter, Plaintiff and Defendant were on friendly terms.  Among other things, Plaintiff house sat for her pet fish while Defendant was on vacation.  Plaintiff also represented Defendant's husband, pro bono, concerning a legal dispute of his, to successful conclusion.

## Defendant's Failed Job Effort

11.     In October 2020, during the midst of the pandemic, Defendant asked Plaintiff if she could work out of his employer's office for a week.  Plaintiff agreed.  Thereafter, impressed with the office space, Defendant began relentlessly lobbying Plaintiff to find a position for her at his firm, which was located within a short walking distance of their homes.  Defendant explained to Plaintiff that she was hoping to start a family, and no longer wanted a daily commute to midtown. She also told Plaintiff that she was looking for a less intense job than her current one in the financial services sector, in which she had some sort of bookkeeping role.

12.     On April 23, 2021, for instance, Defendant, unsolicited, texted Plaintiff: "Is the CFO position open at your firm? If it is, I would love to apply for the job! Hana is looking to climb the corporate ladder!??"  Plaintiff responded that his firm's Chief Financial Officer position was occupied, but that he would check with his friend, who was an executive recruiter, as she might know of open CFO positions with other firms.  Defendant declined the offer, responding: "I would rather work where you work - I like to work with you."

13.     On May 3, 2021, Defendant, unsolicited, again reached out to Plaintiff, texting him:

-3-

"Have you convinced your CFO to quit? … Actually the best strategy would be to bring me on board as a Controller for 1 year and then once I know everything we will be able to say goodbye to [your current CFO]." Plaintiff responded by asking her to send her resume.

14. Defendant sent Plaintiff her resume, and then followed up with him, unsolicited, on May 24, 2001 and again on June 1, 2021, and again on June 11, 2021, asking about the status of her application. On July 4, 2021, Plaintiff advised Defendant that the position might be opening up at some point in the future, and Defendant thanked him profusely. Thereafter, Defendant began peppering Plaintiff about compensation, benefits, software, *etc.*

15. On July 9, 2021, Defendant told Plaintiff, "I'm also super excited about my [prospective job] interview - Hopefully everything works out." She thereafter frequently monitored the firm's LinkedIn site for submissions on the open position, as well as making several follow-up inquiries with Plaintiff about the scheduling of her interview.

16. Finally, on August 25, 2021, Defendant was interviewed for the position.

17. On September 7, 2021, Plaintiff informed Defendant that she would not be offered a position with the firm. Defendant's friendliness dissipated almost immediately.

18. On September 21, 2021, Defendant caused the condominium's counsel, who acted under her direction as Board President, to make a series of harassing calls to the office manager of Plaintiff's firm. (Counsel knew the identity of the firm's office manager from her having arranged Defendant's job interview two weeks prior.) As Board President, Defendant also proceeded to sabotage a resolution to an unrelated legal matter in which Plaintiff's wife was being stalked and harassed in the Building's public areas (a case on which Plaintiff's ultimately prevailed). The situation got so bad that a former Board member later wrote that "Hana is obsessed with" Plaintiff's legal action to the extent that she was neglecting her actual Board duties.

19. On October 27, 2021, Defendant instructed the property manager, Douglas Elliman, to send a letter maligning Plaintiff on the Building's BuildingLink communications system to all the Building's unit owners, a group which includes multiple clients and business associates of Plaintiff, as well as most of his friends and neighbors of three decades.

20. The letter was falsely signed "Board of Managers of Liberty House Condominium," but was in fact directed by Defendant. The letter falsely accused Plaintiff (who had truthfully described the break-down of his friendship with Defendant) of lying in order to "smear" Defendant. According to the letter, and contrary to objective reality, it was Plaintiff who had "solicited [Defendant] about the possibility of her interviewing for a non-legal position at EMM" which Defendant only did "as a polite courtesy," and further, Plaintiff had done so in order to bribe or coerce her ("to curry favor with or to gain leverage over [Defendant]").

21. As set forth above, none of this was true. Defendant's serial dishonesty, however, was only the first of many issues to plague her term as Board President, until the following December, when the individual unit owners overwhelmingly voted for Defendant and every single candidate aligned with her to be removed from office.

### Defendant's Racially Motivated Harassment and Firing of<br>The Building's Beloved Resident Manager

22. In 2019, while Plaintiff was still Board President, the Board voted unanimously to promote the Building's then-Handyman to Resident Manager, Fernando "Tito" Castillo, to succeed to the place of a retiring employee. Mr. Castillo, a 20+ year employee of the condominium association, was honest, talented, and dedicated, with invaluable institutional knowledge about the workings of the Building. During his prior tenure, he had been the recipient of multiple Letters of Commendation, as well as universally positive reviews. He was hired with the enthusiastic endorsement of his retiring predecessor.

23. Mr. Castillo's first year in his new position provided to be a smashing success; resident reviews were overwhelmingly positive. Indeed, for the four-year period from October 2016 through October 2020 for which employment records existed, spanning the tenure of three separate Board Presidents, Mr. Castillo had not received a single negative performance review. That all changed in October 2020, however, once Defendant took over.

24. From the moment she became Board President, Defendant made clear to Plaintiff that she did not want Mr. Castillo to remain as Resident Manager, even though she was unable to articulate a single issue with his work performance. Until then, Defendant had had no direct dealings with Mr. Castillo as Resident Manager, nor did her work experience as a bookkeeper give her the skill set to judge most of the functions a resident manager performs. However, Mr. Castillo is of Puerto Rican heritage, which Defendant viewed as somehow inconsistent with a management-level position. As Mr. Castillo later pled in his discrimination suit, Defendant "immediately began to exhibit racial animus towards [Mr. Castillo] when she took office" and soon thereafter began injecting "false allegations of performance issues to serve as a predicate for his termination." She ultimately fired him and replaced him with an unqualified Caucasian.[1]

25. Long before that discrimination suit was filed, it had become apparent to all that Defendant was leading the Building in a very bad direction. Shortly after their election, two of Defendant's fellow Board members, upon realizing Defendant's targeting of Mr. Castillo—despite having run for the Board at Defendant's request—resigned in disgust.

---

[1] *See* First Amended Verified Complaint, *Castillo v. Board of Managers*, N.Y. County Sup. Ct. Index No. 159234/2022. After Defendant was resoundingly voted out as Board President in early 2023, the new Chair on the Liberty House Committee of Staffing and Legal Affairs—a 28+ year professional investigator to the Federal defense bar—conducted an independent review of the basis for Defendant's termination of Mr. Castillo, and found it to be meritless. He further concluded that Defendant had subjected Mr. Castillo to defamatory letters for "no basis other than spite," and that Mr. Castillo's claims would "likely be FULLY in favor of [him] at trial." Shortly thereafter, the Board voted to restore Mr. Castillo to his position with back pay. Only Defendant and one other Board member voted against it.

26.     Plaintiff, having had eighteen years of prior Board experience, counseled caution to the other remaining Board members in a January 27, 2022 email to them:

> I am writing as a longtime unit owner and former Board President.  I believe each of you to be well-meaning persons acting in good faith.  However, you are all new to the Board, and I am concerned you may not have been provided a complete and accurate picture of our excellent Superintendent / Resident Manager ….  For the past 23 years, including my 18 years on the Board, I have known [him] to be a committed, honest and hardworking employee. …  As I hope you will agree, telling a faithful, beloved employee of 23 years, whose wife and children live with him in the building, to 'pack your bags' on one week's notice, in the middle of a pandemic, does not reflect the values of this building or its unit owners, not do I believe it reflects the values of any of you.  As Board members, [property manager] Douglas Elliman is your agent, and acts in your name.  As fiduciaries, it is up to you to direct and control their actions, and not simply to take them at their word.

27.     Defendant, suffice it to say, did not take this well.  She declared that Plaintiff, by his email, was somehow meant to "intimidate" the Board.  She directed condo counsel to write Plaintiff and advise him that he was forbidden from directly addressing any Board member on any issue ever again, and would instead have to communicate solely through counsel.

28.     By this point, however, Plaintiff was not the only Building resident unit owner advocating for Mr. Castillo to remain as Resident Manager.  A resident revolt was brewing, and Defendant was unable to bottle it up for any longer.  When two other longtime unit owner residents not previously involved in condominium politics learned of the hostile work environment to which Mr. Castillo was being subjected, they decided to take action.

29.     Their Change.org Petition, eventually signed by 120+ unit owners (a majority of the condominium association), stated as follows:

> Tito is a super Superintendent, and has been a cherished member of the Liberty House family since 1999. His institutional knowledge is integral to the well-being of our building and its residents.  He deserves compensation and authority commensurate with his experience and certifications, and a workplace environment free of abuse. Please sign our online petition to show your support for the great job [he] continues to do. Thank you!

30.     The smashing success of this petition drive was a rebuke to Defendant, and she clearly viewed it as a humiliation. She demanded that the condo's lawyers take action in response but, upon information and belief, they told her this was not a legal matter on which they could assist. So Defendant decided to take matters into her own hands.

### Defendant's Libelous Email

31.     On January 27, 2022, an anonymous email was sent to all of the petition signatories, consisting of over a hundred friends, neighbors of Plaintiff (some of whom were also his clients). In the ensuing days, starting on January 29 at 6:57 PM and continuing through January 31 at 11:10 AM, the same email was sent to 42 of Plaintiff's coworkers from the same Hotmail account, starting with the Chairman of Plaintiff's firm and including all of his partners

32.     The Libelous Email told the petition signatories they had somehow been tricked into signing the pro-Castillo petition by Plaintiff who, despite not actually being the proponent of the petition, was depicted without evidence as its mastermind.

33.     A private investigator traced the Libelous Email to Amsterdam in the Netherlands, the nation where, not coincidentally, Defendant was raised and much of her family still resides. (No other Building resident has such a connection.) Moreover, the Libelous Email was written in the same stilted English style of Defendant, used her same turns of phrase, and repeated many of her prior false and defamatory claims. Shown the email, a close friend of hers recognized the email as having been drafted by Defendant in her unique writing style.

34.     Defendant was the author.

35.     Virtually every statement in the Libelous Email was a lie. The true and sole purpose of the Libelous Email was to malign Plaintiff out of pure malice, a motive Defendant tried to mask by concocting a preposterous cover story for the email's anonymous author.

36. Defendant began her Libelous Email with stolen valor, falsely claiming to be an American veteran of the Vietnam War: "Dear Neighbors, I'm a veteran of the Vietnam War that took place in the 60s. I have had many unpleasant experiences and have seen quite a lot during my lifetime, everything from people being killed and being abused. I moved to New York City in 1982 a place where I'm proud to call my home. I purchased our first apartment in this building in 1988 and since then have purchased other real estate in the city."

37. This biography was fabricated. There is <u>no</u> unit owner who is a retired Vietnam War veteran (let alone one living in Holland). As for Defendant, needless to say she is not a Vietnam War veteran. She was born almost a decade after that war had ended, and only moved to the U.S. in 2009. Her CV lists no military experience of any kind.

38. Defendant's Libelous Email continued: "I write to you today to come forward with the current situations and I hope that unit owners will understand how they are being manipulated by one unit owner, in particular, [Plaintiff]. … In 2019, two former employees at [Plaintiff's prior employer] accused [him] of sexual harassment and fraud leading [him] to resign effective immediately. I believe this is what is causing [Plaintiff] and his wife ... to be emotionally distraught and unbalanced. His law license should have been revoked in 2019."

39. These are all lies. No one has ever in Plaintiff's entire life so much as accused Plaintiff of harassment, sexual or otherwise, or fraud of any kind whatsoever. Plaintiff left his former job, reluctantly, to accept a higher position at a prestigious firm within walking distance of his home. Plaintiff's wife is generally happy and fulfilled.

40. In her Libelous Email, Defendant then went on to blame Plaintiff for the fact that the lobby renovation went over budget, a favorite talking point of hers over the years. However, here she went even further, falsely accusing Plaintiff of outright bribery: "it has been shared that

-9-

the contractor in charge of the lobby renovation has been seen working in [Plaintiff's] apartment on numerous occasions, while the lobby construction was ongoing. Has [Plaintiff] and his wife received kickbacks during the lobby renovation?"

41. These, too, were fabrications. The lobby contractors performed zero work (indeed, never set foot in) Plaintiff's home, neither "while the lobby construction was ongoing" nor after. The lobby contractors were recommended by the Building's condominium sponsor, not Plaintiff, and approved by a unanimous Board vote. Tellingly, prior to the Libelous Email, on November 1, 2021, Defendant was heard parroting this same fabrication at a party. No one else has ever leveled such a claim against Plaintiff, as it has zero basis in reality.

42. Defendant then went on to try to further impugn Plaintiff's integrity. First, she described a (successful) action Plaintiff had brought to address the stalking and harassing of his wife on Building property as "frivolous," before claiming that Plaintiff "has been known in Manhattan for filing frivolous lawsuits in order to have insurance companies settle the complaints and subsequently receive financial compensation. … [Plaintiff] is a very skilled manipulator and has a reputation in Manhattan to be a crooked lawyer. My [attorney] son will report [him] next week to the New [York] State Bar Association for violating his license to practice law for misrepresentation, fraud, and violating the professional rules of conduct."

43. Suffice it to say that Plaintiff has no such "reputation," has never been found by any Court to have brought a frivolous lawsuit, does very little plaintiff's-side insurance work, and has never had any disciplinary complaint brought against him ever.

44. Further, any actual attorney would know (but Defendant, a bookkeeper, did not) that disciplinary complaints in this State are not filed with the New York State Bar Association. In any event, no such complaint was ever filed here.

45. What is perhaps most revealing about Defendant's allegation is that, once again, it parrots an allegation previously made by her but no one else. Specifically, a legal invoice from the law firm of Meltzer, Lippe, Goldstein & Breitstone, LLP (the firm then handling the stalking case) reveals that, just two months earlier on November 29, 2021, Defendant had contacted that firm and told a lawyer there that "plaintiffs are having financial difficulties and are seeking to have insurance carrier pay money despite the fact that no injury occurred."

46. In reality, Plaintiff was not having financial difficulties, and had offered on multiple occasions to settle that case without any payment, if the condominium association would merely take action to deal with the stalking and harassment of his wife. (In fact, the claim against the condominium association was later settled on essentially those terms, once Plaintiff was removed as Board President.) Further, Plaintiff was not then, and is not now, having financial difficulties. While not fabulously wealthy, Plaintiff and his wife have been fortunate enough to be in the position to be able to donate hundreds of thousands dollars to charity over the past few years. They have no need to commit insurance fraud, now or ever.

47. Defendant, in her Libelous Email, went on to raise a series of other false and defamatory and ludicrous allegations, such as that Plaintiff had advised Mr. Castillo to "request the staff to go on strike." The entire email is a fever dream of a deeply disturbed person. As time went on, others came to realize this about Defendant as well.

48. That said, the harm to Plaintiff was, and continues to be, immeasurable. While Defendant's allegations were completely fabricated, there was never any meaningful way for the hundreds of recipients to judge their veracity. To this day, Defendant's false allegations, made anonymously in the voice of a pretend Vietnam veteran, continue to hang in the air, permanently damaging Plaintiff's relationships with his neighbors and coworkers.

### The Condo's Counsel and its Property Manager
### <u>Commiserate Over Defendant's Propensity For Dishonesty</u>

49. In the aftermath of the Libelous Email, Defendant came to implement the second part of her plan. Having libeled Plaintiff to the world with her outrageous fabrications, she then sought to bootstrap her own fabrications to further harm Plaintiff.

50. In her Libelous Email, Defendant wrote (in the voice of a pretend Vietnam veteran) that: "I'm going to ask someone on this platform to take the lead in a creation of a petition so that a formal accounting of the lobby expenses is brought forth." When no unit owner "took the lead" in that regard, *Defendant herself* asked a unit owner/friend of hers to send an email to the Board (on which Defendant sat) to demand "detailed information" about "the very public email 'bomb' that was dropped on the topic by" the anonymous Hotmail sender.

51. In response to this choreographed unit owner request to the Board—which, in fact, Defendant herself had initiated—she announced to the Building's unit owners that the Board was considering a "forensic audit," and put the matter to a vote. The unit owners voted overwhelmingly against it. As the condominium association maintains audited financials, the renovation budget was already fully audited. But Defendant's true purpose was to continue the false and defamatory smears she had anonymously propagated against Plaintiff.

52. It soon became apparent to those closest to Defendant that this had all been a ruse. In a candid email to condo counsel, John Janangelo, Executive Managing Director of Douglas Elliman Property Management, commented about Defendant as follows: "**I'm becoming increasingly concerned that Hana's actions are a real problem. Specifically, she is making decisions and allegations not based on fact. I understand who and what [Plaintiff] is but the lobby issue is a prime example of that. I am very concerned.**"

53. The condominium's counsel, Jeffrey Reich of the law firm of Schwartz Sladkus

-12-

Reich Greenberg Atlas LLP, concurred and piled on: "**Agreed, I've had to dial her back on a couple of her ideas and I will continue to try to keep her and the Board from doing anything that will expose them and/or the Condominium to liability.**"

54. Even Defendant tacitly admitted her own wrongdoing. In the months that followed, she asked counsel: "**Can you please let me know your thoughts if the former board members including myself would be covered if John files a suit for defamation?**"

### Defendant's Further Dishonesty and Animus to Plaintiff

55. Mr. Reich, unfortunately, was largely unsuccessful in "dialing back" Defendant's misconduct as Board President, as she continued to propagate lies about Plaintiff, and subvert the mechanisms of condominium governance to try to harm Plaintiff.

56. To name just a few examples, she put out multiple Building-wide communications to all unit owners falsely blaming Plaintiff for supposedly having prepared the employment agreement with Mr. Castillo, which she then falsely blamed for the labor dispute. Even after the aforementioned Jeffrey Reich admitted that he, and not Plaintiff, had prepared the agreement, she continued to propagate the lie. When Plaintiff requested insurance information for a contractor, Defendant directed the Building's staff and property manager not to respond. When Plaintiff's small dog was attacked by a pit bull on building property, within clear view of the security cameras, after watching the videos she directed a junior lawyer at the Schwarts Sladkus firm to lie about it to Plaintiff and tell him: "We reviewed the footage from the date and time of the alleged incident including specifically checking the channels that you referenced. There was no evidence of an incident or interaction between you, your dog and any other dog."

57. While this was going on, Defendant was also going to absurd lengths to obstruct Plaintiff from running again for the Board of Managers.

58.     Among other things, Defendant sought to amend the condominium association's Bylaws to render Plaintiff ineligible on the ground that he had an open claim against the Board. When that measure failed to be enacted, she scheduled the 2022 Annual Unit Owners Meeting for the Tuesday after Thanksgiving, because she thought it would somehow disadvantage Plaintiff from campaigning.  (Plaintiff ultimately did not run.)

59.     Plaintiff can forgive most of this, but not the Libelous Email.  The lies therein were malicious and false, and incredibly injurious to him personally and professionally.  Those lies were never retracted.  They implicate the following causes of action.

## FIRST CAUSE OF ACTION:
## LIBEL

60.     Plaintiff realleges the foregoing paragraphs as if set forth fully herein.

61.     Defendant first caused the Libelous Email to be published on or about October 27, 2021, and then again republished in the days that followed.

62.     The Libelous Email contains numerous materially false and defamatory statements of fact about Plaintiff, as detailed above.

63.     Defendant knew the aforementioned statements were false when she made them, and yet made them out of animus to Plaintiff and a desire to do him harm.

64.     Defendant's statements in the Libelous Email are defamatory because they impugn Plaintiff's honesty, trustworthiness, ethics, morality and professional fitness and abilities, and accuse him of criminal and other misconduct.

65.     As a direct and proximate result of Defendant's libel, Plaintiff has incurred, and continue to incur, incur pecuniary and economic harm, including special damages in the form of lost income.

66.     As a further direct and proximate result of Defendant's libel, Plaintiff has suffered,

and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

67. Defendant was afforded an immediate opportunity to publicly retract the false statements she made in the Libelous Email, but has declined to do so.

68. Plaintiff accordingly is entitled to monetary damages of not less than $20 million.

69. Because Defendant's statements in the Libelous Email were malicious, willful, wanton, and done with reckless disregard for Plaintiff's rights, Plaintiff is further entitled to an award of punitive and/or treble damages.

## SECOND CAUSE OF ACTION:
## LIBEL

70. Plaintiff realleges the foregoing paragraphs as if set forth fully herein.

71. The Libel pled in Count I: (a) falsely charges Plaintiff with one or more serious crimes (*e.g.,* fraud and bribery); (b) states false facts that tend to injure Plaintiff him in his business trade and profession; (c) falsely imputes that Plaintiff is unchaste; and (d) falsely tends to expose Plaintiff to hatred, contempt or aversion, and/or to induce an evil or unsavory opinion of him in the minds of a substantial number of his home and workplace communities.

72. As such, the foregoing libel constitutes libel *per se* under New York law.

73. Plaintiff accordingly is entitled to monetary damages of not less than $20 million.

74. Because Defendant's statements in the Libelous Email were malicious, willful, wanton, and done with reckless disregard for Plaintiff's rights, Plaintiff is further entitled to an award of punitive and/or treble damages.

## THIRD CAUSE OF ACTION:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

75. Plaintiff realleges the foregoing paragraphs as if set forth fully herein.

76. Defendant engaged in conduct toward Plaintiff that is extreme and outrageous so

as to exceed the bounds of decency in a civilized society by, *inter alia*, subjecting him to defamatory statements and publicly accusing him of criminal and other misconduct.

77. These actions were taken with intent to cause, or disregard for, the substantial probability of causing severe emotional distress.

78. As a direct and proximate result of Defendant's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress, including sleepless nights, anxiety, and profound sadness. Plaintiff has led an unblemished career and life. To be falsely accused of such heinous crimes to hundreds of his neighbors, in the building where he has called home for the past three decades, and coworkers, whose trust and confidence he must maintain in order to earn a living and serve his clients, has been profoundly disruptive and emotionally taxing.

79. Plaintiff accordingly is entitled to monetary damages of not less than $20 million.

80. Because Defendant's statements in the Libelous Email were malicious, willful, wanton, and done with reckless disregard for Plaintiff's rights, Plaintiff is further entitled to an award of punitive and/or treble damages.

### FOURTH CAUSE OF ACTION:
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

81. Plaintiff realleges the foregoing paragraphs as if set forth fully herein.

82. Plaintiff has a number of successful business relationships with the recipients of the Libelous Email which, given the nature thereof, it is reasonable to expect to continue.

83. Those successful business relationships include, *inter alia*, his relationships with the other partners at the law firm at which Plaintiff is a partner.

84. The Libelous Email, and the false and defamatory statements made therein, were intended to interfere, and have interfered, with those relationships by harming Plaintiff's reputation and standing among his partners and by detracting him from productive endeavors.

85. Defendant was motivated by ill-will, malice, and a desire to injure Plaintiff.

86. Plaintiff accordingly is entitled to monetary damages of not less than $20 million.

87. Because Defendant's statements in the Libelous Email were malicious, willful, wanton, and done with reckless disregard for Plaintiff's rights, Plaintiff is further entitled to an award of punitive and/or treble damages.

### FIFTH CAUSE OF ACTION:
### PRIMA FACIE TORT

88. Plaintiff realleges the foregoing paragraphs as if set forth fully herein.

89. As set forth above, the Libelous Email, and the false and defamatory statements made therein, subjected Plaintiff to the intentional infliction of harm, without any excuse or justification, resulting in special damages, by acts that may otherwise be legal.

90. Such special damages include, without prejudice, a resulting loss in annual income in the year following the Libelous Email which can reasonably be expected to continue for the balance of Plaintiff's career.

91. Plaintiff has conducted a net present value calculation of his present and future lost income for the expected twenty remaining years in his professional practice. Applying standard valuation criteria and methodology, Plaintiff currently calculates (subject to expert review later in the case) his special damages at $2,883,004.83.

92. Plaintiff accordingly is entitled to monetary damages of not less than $20 million, inclusive of the foregoing special damages.

93. Because Defendant's statements in the Libelous Email were malicious, willful, wanton, and done with reckless disregard for Plaintiff's rights, Plaintiff is further entitled to an award of punitive and/or treble damages.

## SIXTH CAUSE OF ACTION:
## INJURIOUS FALSEHOOD

94. Plaintiff realleges the foregoing paragraphs as if set forth fully herein.

95. Defendant's statements about Plaintiff in the Libelous Email are false.

96. Such statements were published to third parties to which no privilege attached.

97. Defendant made such statements solely out of malice.

98. Such statements have caused Plaintiff special damages, as set forth above.

99. Plaintiff accordingly is entitled to monetary damages of not less than $20 million, inclusive of the foregoing special damages.

100. Because Defendant's statements in the Libelous Email were malicious, willful, wanton, and done with reckless disregard for Plaintiff's rights, Plaintiff is further entitled to an award of punitive and/or treble damages.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff request that this Court enter judgment as follows:

(a) For each Cause of Action, awarding Plaintiff a judgment against Defendant in the amount of no less than $20 million, including special damages of no less than $2,883,004.83, to reimburse him for the harm he has sustained as a consequence of the Libelous Email, plus punitive and/or treble damages, pre-judgment interest, attorney's fees (including quantum meruit for his own time), and costs; and

(b) awarding Plaintiff all other and further relief that is just and proper.

Dated:  New York, New York
        April 19, 2024

JOHN DELLAPORTAS
*Pro Se Plaintiff*